IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:13-cv-13

| | | |
|---|---|---|
| TONEY LEE ARRINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | **(VERIFIED)** |
| | ) | |
| THE CITY OF ROCKY MOUNT; Corporal | ) | |
| M.B. NEWSOME, # 4755, and Officer B.C. | ) | **JURY TRIAL DEMANDED** |
| LAWTON, # 5553, of the Rocky Mount | ) | |
| Police Department, in their individual | ) | |
| capacities; JAMES L. KNIGHT, Sheriff of | ) | |
| Edgecombe County; Detention Officer RAY | ) | |
| A. HINES, Detention Sergeant DORIS J. | ) | |
| THOMAS, and Detention Sergeant HARRIS | ) | |
| of the Edgecombe County Detention Center, | ) | |
| in their individual capacities; THE OHIO | ) | |
| CASUALTY INSURANCE COMPANY, as | ) | |
| surety; and EDGECOMBE COUNTY; | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES the Plaintiff Toney Lee Arrington, by and through counsel, complaining of the Defendants, and alleges and states that:

### NATURE OF THE CASE

1.     In this action Mr. Arrington seeks compensatory and punitive damages and other relief arising under 42 U.S.C. §§ 1983 and 1988, the Fourth, and Fourteenth Amendments to the United States Constitution, and North Carolina's Constitution and laws to redress Defendants' unlawful and unconstitutional conduct.   The various Defendants' actions as alleged herein, constituted, *inter alia*, unreasonable seizure and deliberate indifference to serious medical needs in violation of Mr. Arrington's rights under the Fourth and Fourteenth Amendments to the

1

United States Constitution, and, together with related claims, in violation of North Carolina's Constitution and law. Mr. Arrington should be awarded compensatory and punitive damages, along with other relief, for these violations of his federally and state protected constitutional rights and of state law.

## JURISDICTION AND VENUE

2.      This case presents an actual case and controversy arising under the Fourth and Fourteenth Amendments to the United States Constitution. This case also arises under the provisions of 42 U.S.C. §§ 1983 and 1988.

3.      Original jurisdiction over this case is conferred upon this Court pursuant to 28 U.S.C. § 1331, 42 U.S.C. §§ 1983 and 1988, and the United States Constitution because this case arises under the Constitution and laws of the United States. Original jurisdiction over this case is also conferred upon this Court pursuant to 28 U.S.C. § 1343(a) because this action is to redress the deprivation by the Defendants, under color of state law, of Mr. Arrington's rights, privileges, and immunities secured by the United States Constitution and laws of the United States.

4.      This Court has jurisdiction over Mr. Arrington's North Carolina state law claims pursuant to 28 U.S.C. § 1367 because they share a common nucleus of operative fact with his federal claims.

5.      Venue is proper in this District under 28 U.S.C. § 1391(b) because one or more Defendants reside in this District and the claims asserted herein arose in this District.

## PARTIES

6.      The Plaintiff, Toney Lee Arrington (hereinafter "Arrington") was, at all relevant times was a resident of Edgecombe County, North Carolina and is now a resident of New Jersey.

7.      Upon information and belief, Defendant City of Rocky Mount (hereinafter "City") is a

municipal corporation properly chartered, organized, and existing under the laws and Constitution of North Carolina, and is the employer of Defendants M. B. Newsome, Officer # 4755, and B. C. Lawton, Officer # 5553, who were appointed as officers of the City's Police Department (hereinafter "RMPD") pursuant to N.C. Gen. Stat. § 160A-28.

8.      Upon information and belief, Defendant Corporal M. B. Newsome (hereinafter "Newsome") is, and at all times relevant to this action, was mentally competent, more than eighteen years of age, not in military service, *sui juris*, and a citizen and resident of North Carolina.  Newsome is being sued in his individual capacity.  Upon information and belief, during all relevant times, Newsome was employed by the City as an Officer and Corporal of the RMPD, Officer # 4755, and was acting in the course and scope of his official duties as a police officer and under color of state law.

9.      Upon information and belief, Defendant Officer B. C. Lawton (hereinafter "Lawton") is, and at all times relevant to this action, was mentally competent, more than eighteen years of age, not in military service, *sui juris*, and a citizen and resident of North Carolina.  Lawton is being sued in his individual capacity.  Upon information and belief, during all relevant times, Lawton was employed by the City as an Officer of the RMPD, Officer # 5553, and was acting in the course and scope of his official duties as a police officer and under color of state law.

10.     Upon information and belief, Defendant Sheriff James L. Knight (hereinafter "Sheriff Knight") is, and at all times relevant to this action, was mentally competent, more than eighteen years of age, not in military service, *sui juris*, and a citizen and resident of Edgecombe County, North Carolina.  Sheriff Knight is being sued in his official capacity.  Upon information and belief, Sheriff Knight is, and all relevant times, was

a) the duly elected and inducted Sheriff of Edgecombe County;

b) in control of the Edgecombe County Detention Center ("ECDC");

c) the final decision making authority over law enforcement policies and personnel of his office;

d) directly responsible for the appointment, retention, training, supervision, and conduct of his deputies, detention officers, employees, and agents;

e) acting in the course and scope of his official duties as Sheriff of Edgecombe County and under color of state law; and

f) vicariously liable for the actions of his agents, employees, officers, managers, supervisors, jailers and/or deputies.

11.    Upon information and belief, Defendant Detention Officer Ray A. Hines (hereinafter "Hines") is, and at all times relevant to this action, was mentally competent, more than eighteen years of age, not in military service, *sui juris*, and a citizen of North Carolina.  Hines is being sued in his individual capacity.  Upon information and belief, Hines is, and all relevant times, was employed by Sheriff Knight as a detention officer and worked at the ECDC.

12.    Upon information and belief, Defendant Detention Sergeant Doris J. Thomas (hereinafter "Thomas") is, and at all times relevant to this action, was mentally competent, more than eighteen years of age, not in military service, *sui juris*, and a citizen of North Carolina.  Thomas is being sued in her individual capacity.  Upon information and belief, Thomas is, and all relevant times, was employed by Sheriff Knight as a detention officer and worked at the ECDC.

13.    Upon information and belief, Defendant Detention Sergeant Harris (hereinafter "Harris") is, and at all times relevant to this action, was mentally competent, more than eighteen years of age, not in military service, *sui juris*, and a citizen of North Carolina.  Harris is being sued in his individual capacity.  Upon information and belief, Harris is, and all relevant times, was

employed by Sheriff Knight as a detention sergeant and worked at the ECDC.

14.     Upon information and belief, Defendant Ohio Casualty Insurance Company ("Surety") was a corporation organized and existing under the laws of Ohio and now has re-domesticated and is existing under the laws of New Hampshire and during all relevant periods is and was licensed to conduct business and regularly conducts business in the State of North Carolina. Surety, among other activities, was engaged in issuing official sheriff's bonds pursuant to N.C. Gen. Stat. § 162-8.   At all times alleged herein, Sheriff Knight was a principal on official sheriff's bonds issued by Surety, said bonds being in the penal sum of Twenty-Five Thousand Dollars ($25,000).   Surety is being sued as the surety on Sheriff Knight's official sheriff's bonds, pursuant to N.C. Gen. Stat. § 58-76-5.

15.     Edgecombe County ("Edgecombe County") is a body politic and corporate existing under and existing by virtue of Chapter 153A of the North Carolina General Statutes.   Edgecombe County is responsible for funding and maintaining an adequate jail facility for the county and in this capacity is liable for the related acts of Sheriff Knight and his deputies, jailors, agents and employees.   Upon information and belief, Edgecombe County established, acquired, erected, repaired and operated the ECDC as a county confinement facility pursuant to N.C. Gen. Stat. § 153A-218; and had a non-delegable statutory duty pursuant to N.C. Gen. Stat. § 153A-225 to "provide for medical supervision and emergency medical care for prisoners to the extent necessary for their health and welfare."

16.     Edgecombe County, North Carolina is where

    a)  a substantial part of the events giving rise to the Plaintiff's claims occurred;

    b)  the causes of action in this case arose; and

c) the Plaintiff previously resided, where the City is located, and upon information and belief, where one or more of the individual Defendants reside.

## WAIVERS OF IMMUNITY

17.     Plaintiff incorporates by reference and re-alleges the allegations in preceding paragraphs as though fully set forth herein.

18.     Sheriff Knight furnished a bond secured by Surety pursuant to N.C. Gen. Stat. § 162-8 and Surety is a named Defendant party to this action, as required by N.C. Gen. Stat. § 58-72-5.

19.     Upon information and belief, Sheriff Knight, in his official capacity in his Office of Sheriff of Edgecombe County, and any and all agents, employees, officers, jailers and/or deputies, waived sovereign immunity to the extent of Surety's bond.

20.     Upon information and belief, Edgecombe County and Sheriff Knight and his deputies, jailers, agents and employees waived or further waived any sovereign immunity to the extent they had in force at all relevant times, plans of insurance entered pursuant to N.C. Gen. Stat. § 153A-435 and/or participation in a local government risk pool pursuant to N.C. Gen. Stat. § 58-23, to cover acts, omissions, negligence and/or misconduct as alleged hereinafter by Plaintiff.

21.     Upon information and belief, the City and any and all of its agents, employees, and officers waived sovereign or governmental immunity that could have been raised to Plaintiff's Complaint in that the City had in force at all relevant times,

   a) pursuant to N.C. Gen. Stat. § 160A-485,

      i) plans of insurance entered into, and/or

      ii) City Council resolutions that waived immunity and established a funded reserve; and/or

   b) pursuant to N.C. Gen. Stat. § 58-23, participated in local government risk pool or pools.

22.     In the alternative, if it is determined that the City, Sheriff, or Edgecombe County has not waived sovereign or governmental immunity, that any such waiver does not provide Plaintiff an adequate remedy at state law, or that Plaintiff has no adequate remedy at state law for any other reason, then Plaintiff asserts a direct cause of action for violations of Plaintiff's rights under the North Carolina Constitution.

## FACTUAL ALLEGATIONS

23.     Plaintiff incorporates by reference and re-alleges the allegations in preceding paragraphs as though fully set forth herein.

24.     On February 13, 2010 Plaintiff attended the wedding reception of Kevin Lasco, Sr. ("Lasco" or "Mr. Lasco") and Cassandra Savoy Lasco ("Mrs. Lasco") at 529 Park Avenue in Rocky Mount.  During that evening at approximately 8:15 p.m. a melee broke out and a large crowd of attendees beat and chased Plaintiff.  Mrs. Lasco also beat Plaintiff's brother, Michael Arrington.  A number of calls were made to 911 to summon police.

25.     During the melee MLasco approached Plaintiff from a place of hiding and "sucker punched" Plaintiff on the side of his face.  Lasco wore brass knuckles when he struck Plaintiff.

26.     Lasco's blow shattered bones on both sides of Plaintiff's jaw and broken bones cut through the inside of his mouth.

27.     Lasco pursued the stunned Plaintiff as he staggered backward.  Plaintiff struck Lasco in the head in self-defense with a broomstick he picked up off the ground.  The broomstick broke. Another man, upon information and belief Mrs. Lasco's brother, picked up the broken broomstick and beat Plaintiff in the chest with it.

28.     Others in the crowd then attacked and chased Plaintiff.

29.     Plaintiff fled the crowd and sought refuge at the home of Ms. Pearlie Hyman located a

few houses away at 618 E. Highland Avenue.

30.     Ms. Pearlie Hyman called 911 several times.  The crowd tried to gain entrance to her house to get Toney Arrington.

31.     Upon information and belief, Newsome, Lawton, and/or Officer V. Hussey arrived on the scene and only questioned Mr. and Mrs. Lasco about the incident, and then sought Plaintiff and his brother Michael based on their statements.

32.     Upon information and belief, the broken broomstick was on the ground and visible to Newsome, Lawton and Hussey, and one of the officers collected the broomstick pieces.

33.     Upon information and belief, based upon the Lasco's statements, Newsome and another officer went to arrest Michael Arrington who was on his porch.  Stacey Ricks told the officers that Mrs. Lasco had attacked Michael Arrington on his porch, but they ignored his statements. Newsome and the other officer arrested Michael Arrington, who was then transported to the police station and magistrate's office by the other officer.

34.     Newsome and Lawton refused to speak with Stacey Ricks or Notosha Savage who witnessed the crowd's attack on Plaintiff and his brother, Michael Arrington, and Kevin Lasco's assault with brass knuckles on the Plaintiff as they told the officers that the Arringtons were the victims.

35.     On or about 8:30 p.m. on February 13, 2010, three police officers, including Newsome and Lawton, entered Ms. Hyman's home with Plaintiff's son to help identify and arrest Plaintiff.

36.     Plaintiff was spitting out blood from his mouth when they entered.

37.     An ambulance arrived and a paramedic entered Ms. Hyman's house and began to treat her daughter.

38.     Plaintiff asked Newsome why he was being arrested because the mob and Lasco had

attacked him.

39.     Plaintiff spit blood into his hand and showed it to Newsome and Lawton.

40.     Plaintiff explained that he had been beaten by the crowd, that Lasco had hit him with brass knuckles and broken his jaw, that he needed emergency medical attention, that he was in great pain, and that he needed to be taken to the hospital.

41.     Plaintiff was obviously injured and in great pain.

42.     Newsome told Plaintiff that he could see the nurse at the jail.  There was one paramedic at the house and in the same room as Plaintiff and the officers and another ambulance arrived at Ms. Hyman's house shortly later.  Newsome refused to let Plaintiff be examined by a paramedic or treated at the house.

43.     Newsome handcuffed Plaintiff and placed him in a police car.

44.     Plaintiff was not allowed to see any of the paramedics who were at the house and whose ambulances were parked on either side of the police car that held Plaintiff.  Plaintiff was held in the police car at the scene for approximately twenty to thirty minutes.

45.     Newsome and Lawton then drove Plaintiff to the police station.  Plaintiff again asked to be taken to the hospital because his jaw was broken, his mouth was bleeding, and he was having trouble breathing.  Plaintiff also complained that the handcuffs were too tight and this was making it more difficult for him to breathe.  Newsome again refused to take Plaintiff to the hospital and told him that he would only take him to the jail and that Plaintiff could see the nurse there.

46.     Plaintiff was fingerprinted at the police station and was then driven to the magistrate's office.  Plaintiff continued to request to be taken to the hospital because he was seriously injured. He also complained that he could not breathe and that having his hands cuffed behind him made

it worse.

47.     On arriving at the magistrate's office, Plaintiff again told the Newsome and Lawton that he was having trouble breathing and that the handcuffs were too tight.  Newsome re-cuffed Plaintiff's hands in front of his body and took him into the magistrate's office.

48.     Michael Arrington ("Michael"), Plaintiff's brother, Stacey Ricks and Notosha Savage were at the magistrate's office when Plaintiff was brought in by the officers.

49.     The magistrate instructed Michael about his assault charges and Michael explained that he was the one who was attacked.  The magistrate threatened Michael with contempt and told him to sit down.  Stacey and Notosha also explained that Michael was a victim of the attack but the magistrate told them to be quiet and that he did not want to hear from them.

50.     The magistrate then told Plaintiff that he was charged with felony assault with a deadly weapon inflicting serious injury and set a $10,000.00 bond.  Plaintiff told the magistrate that he was the one who was assaulted, that he was seriously injured in the assault, and that his jaw was broken when Lasco hit him in the face with brass knuckles. The magistrate asked the officers if they saw any brass knuckles and they replied no and told the magistrate that Plaintiff was the aggressor.  Upon information and belief, the officers showed the magistrate the broomstick pieces and said that it was the weapon that Plaintiff used to hit Lasco.

51.     Plaintiff spit blood into his hands and showed the blood to the magistrate and Newsome, Hussey, and Lawton.  Newsome un-cuffed Plaintiff's hands and re-cuffed them behind Plaintiff's back.  Upon information and belief, Newsome did this to conceal the blood on Plaintiff's hands. In response to Plaintiff's plea to be taken to a hospital, Newsome told him "you will get medical attention wherever anybody would take you.  If I have to transport you to a facility you will get medical attention at that facility, and if you make bond, it will be somebody else's responsibility

to get you medical attention."

52.     The magistrate then told Plaintiff that he was the aggressor. Michael Arrington complained loudly that he and Plaintiff were the victims. The magistrate held Michael in contempt and had Lawton take him out into the hall. Stacey and Notosha told the magistrate that Plaintiff was not the aggressor and tried to explain the details. The magistrate told them that he did not want to hear from them and that he would hold them in contempt of court as well if they did not leave. Newsome opened the door and told Stacy and Notosha to leave and they did.

53.     Plaintiff asked to have a picture taken of his injured mouth, but his request was refused. Plaintiff told the magistrate that he wanted to press charges against Lasco for breaking his jaw. The magistrate told Plaintiff that he could come back after making bond and then swear out a warrant but that the magistrate was not going to let him swear out a cross warrant at that time.

54.     Plaintiff and Michael were taken by Newsome and Lawton to the ECDC in the same car.

55.     The officers were listening to gospel music on the radio during the ride. Plaintiff continued to ask for emergency medical attention. Newsome continued to tell Plaintiff that he would see the nurse at the jail. Plaintiff asked the officers how they could be listening to gospel music when they were doing something that they knew was so wrong. Michael told the officers that they knew that they had arrested the wrong people because they were the ones who had been attacked. Newsome told them that this would not be the last time he would arrest them and then he slammed the plexi-glass divider shut and left if shut for the rest of the ride to the jail.

56.     Plaintiff realized that any further attempts to complain or get emergency medical attention were futile at that point.

57.     On or about 11:00 p.m. on February 13, 2010, Newsome and Lawton escorted Michael and Plaintiff into the ECDC. On arrival, Plaintiff asked Newsome about getting medical

attention and Newsome said that *after* Plaintiff was booked into jail that he could see a nurse.

58.    Newsome and Lawton took the Arringtons into the ECDC.  Newsome handed paperwork to Thomas and transferred custody of the Arringtons to the Sheriff.

59.    Newsome and Lawton quickly left.  They did not inform Thomas that Plaintiff was injured.  Upon information and belief, Newsome and Lawton violated policies and procedures by not reporting to the ECDC that Plaintiff was injured.  Plaintiff understood that Newsome's paperwork contained a report of his injuries, but upon information and belief, it did not.  Plaintiff also understood from Newsome that he would see a nurse *after* he was processed into the jail.

60.    Plaintiff was searched by two black detention officers, one male and one female and one officer started the inmate screening process while Thomas watched.  Plaintiff told them that he was hurt.

61.    Plaintiff asked Thomas when he would get to see the nurse.  Plaintiff told Thomas that his jaw was broken when he was hit with brass knuckles and he spit blood into his hands to show her.  Thomas said "Oh my Lord," and said that the arresting officers should have taken him to the hospital.   Thomas then told a detention officer to lock Plaintiff in a holding cell.

62.    Upon information and belief, the ECDC nurse had left the ECDC for the evening while Plaintiff was being processed and there were no other medical professionals at the ECDC.

63.    A detention officer came into the holding cell to complete the intake screening process.  Plaintiff again told the detention officer about his injuries.  Plaintiff was then taken to the booking desk, had his picture taken, and was dressed out.  He was placed in the general prison population in a pod by Hines.  Plaintiff was not allowed to see a nurse.

64.    About an hour later Hines made rounds and Plaintiff told him to tell Thomas again that he needed to go to the hospital because he was hurt, that his jaw was broken, that he was bleeding,

and that he was having difficulty breathing and that he was in great pain.  Plaintiff also asked for something for the pain because he was suffering greatly.

65.    Approximately an hour later Hines made rounds again and Plaintiff again asked if he had told Thomas that he needed emergency medical care.  Hines told Plaintiff that "I told her, but she ain't said nothing."  Other detainees also told Hines that Plaintiff needed to go to the hospital because he was hurt bad.

66.    During all this time Plaintiff kept pacing the pod going to the sink to spit out blood.  The other pod detainees were upset because of the blood.

67.    When Hines made rounds again about an hour later, all the detainees began yelling at him that Plaintiff was really hurt and that he needed to go to the hospital, that he was spitting blood, and that they were worried about being exposed to his blood.

68.    About 10 minutes later Hines told Plaintiff to collect his belongings and took him into a holding cell beside the nurse's unit.

69.    Plaintiff told Hines that he needed emergency medical attention immediately.  Hines told Plaintiff that the nurse would be back the next day.  Plaintiff told Hines that he could not wait until then because he was seriously injured and was in great pain.  Hines said that there was nothing that he could do.  Hines refused Plaintiff's request for any pain reliever, including aspirin, Tylenol or ibuprofen.

70.    Plaintiff continued to rinse his mouth and spit blood in the sink.  Plaintiff had increasing difficulty breathing due to his injuries, which was made even more difficult by the hot and stuffy room.  Plaintiff asked Hines to be placed in a room with air conditioning because he could not breathe.  Hines refused this request.

71.    Plaintiff used a bath towel to help absorb the blood flowing from his mouth.  The towel

and the sheets on his cot and mat were soaked in blood. Plaintiff had extreme difficulty breathing and he suffered excruciating pain. Plaintiff's face and neck were extremely swollen and his nasal passages were closed, forcing him to breathe through his mouth. This hurt his jaw more as he drew air across the open wounds in his mouth. Plaintiff could feel the broken bones in his jaw cut the inside of his mouth and jaw whenever spoke, spit blood, or swallowed. Plaintiff also had a fever. Plaintiff did not think that he would survive the night and he was in despair because he could not get any medical attention.

72.     Upon information and belief, at some time during the evening or early morning Thomas left the ECDC.

73.     Upon information and belief, Thomas was aware that Plaintiff was seriously injured and that he would not receive any medical attention until the morning.

74.     Upon information and belief, Harris was the on-duty shift supervisor at the ECDC after Thomas left.

75.     Upon information and belief, Harris was aware of Plaintiff's injuries and that he had not received any medical attention.

76.     Harris visited Plaintiff in the holding cell next to the nurses' unit. Plaintiff explained that he was seriously injured, that his jaw was broken when he was hit with brass knuckles, that he could not breathe, that he was bleeding, and that he was in severe pain. It was obvious that Plaintiff was seriously injured due to his anguish, his very swollen face and neck, and the blood that he was spit out and that soaked his towel and the covers of the cot. Plaintiff pleaded with Harris to be taken to a hospital. Harris told Plaintiff that he would not do anything, that this was Thomas' mess, and that he would see the nurse in the morning. Harris refused Plaintiff's request for any pain reliever or to move him to a room with air conditioning.

77.     Upon information and belief, Thomas violated policies and procedures by accepting the injured Plaintiff into the Sheriff's custody.  The subsequent conduct of Thomas, Harris, and Hines was motivated in part by their desire to avoid any escalation that would increase the visibility of the situation by, for example, calling EMS to examine Plaintiff, taking Plaintiff to a hospital, calling a staff medical professional back into the ECDC to treat Plaintiff, or taking any action that might cause Sheriff Knight and/or Edgecombe County to be liable for any overtime/call-in pay or external emergency medical care expense.

78.     The morning of February 14, 2010, Plaintiff saw and heard the nurse arrive.  The nurse saw other inmates before she saw Plaintiff.

79.     On or about 7:20 a.m. on February 14, 2010, Plaintiff was finally taken to see the nurse.

80.     The nurse asked Plaintiff about his obvious injuries.  She then looked into his mouth and exclaimed "Oh My God! You are not supposed to be in here!  Why did they let you in to the jail knowing that you were injured!?  Why weren't you taken to the hospital!?"

81.     Plaintiff had a fever, with a temperature of 101.5 degrees Fahrenheit, and elevated blood pressure, heart rate, and respiration rate.  Plaintiff had a large cut on the inside of his mouth on the back of his jaw and gum.  Plaintiff's jaw had been severely fractured, and bone was visible through the cut in the back of his jaw and gum and his teeth were obviously misplaced.

82.     The nurse told a detention officer to get papers to transport Plaintiff to a hospital immediately.

83.      On or about 7:45 a.m. on February 14, 2010, Plaintiff was taken to Heritage Hospital for emergency treatment.

84.     The medical staff at Heritage Hospital sent Plaintiff via Emergency Critical Care Transport to the nearest tertiary critical care center for what they diagnosed as a comminuted

mandible fracture, and specified that Plaintiff could only be moved by stretcher. On or about 4:00 p.m. on February 14, 2010, Plaintiff was transported to Pitt County Memorial Hospital ("PCMH").

85.     At PCMH, Plaintiff received reconstructive surgery on his jaw which included permanent surgical implants. His mouth was wired shut for approximately four weeks.

86.     On or about February 15, 2010, Plaintiff was transferred to Central Prison for safekeeping due to his medical needs.

87.     On or about March 12, 2010, Plaintiff was transferred back to the ECDC.

88.     On or about April 8, 2010, the District Attorney's Office dismissed the charges related to the February 13, 2010 incident against Michael Arrington.

89.     On or about April 14, 2010, Plaintiff was released from the ECDC.

90.     On or about April of 2010, Plaintiff attempted to bring assault charges against Lasco, but the magistrate told Plaintiff that only the investigating officer of the Rocky Mount Police Department could bring charges against Lasco.

91.     On or about April 19, 2010, Plaintiff filed a complaint with the Rocky Mount Police Department regarding Lasco's attack on him, his arrest, and the denial of access to medical attention by the arresting officers.

92.     On August 4, 2010, Plaintiff's attorney sent an email to John Manley, Rocky Mount Chief of Police, regarding the lack of investigation into the incident because the police report indicated that the charges against Plaintiff were based entirely upon the statements of Lasco, who had attacked and injured Plaintiff, and Lasco's wife.

93.     On August 10, 2010, on Chief Manley's referral, Plaintiff's attorney sent an email to Sergeant Seighman and Captain Fahnestock of the Rocky Mount Police Department with the

16

names of Stacey Ricks and Notosha Savage, who were witnesses to the attack.

94.     Upon information and belief, no one from the Rocky Mount Police Department attempted to contact Stacey Ricks or Notosha Savage to interview them.

95.     Plaintiff was tried in Edgecombe County Superior Court on February 14, 2011.  The jury was instructed on Felony Assault With a Deadly Weapon Inflicting Serious Injury and the lesser included offenses of Assault With a Deadly Weapon, Assault Inflicting Serious Injury, and Simple Assault. Plaintiff contended that he acted in self-defense against Mr. Lasco.  The jury acquitted Plaintiff of all charges.

96.     During the trial, the State introduced a sharp metal mop-head as the alleged weapon that Plaintiff used to hit Lasco, and the Lascos testified that it was the weapon and that they found and turned over to the assistant district attorney the month before the trial.  This was not the broomstick that Plaintiff used to strike Lasco.  Newsome testified that that none of the five officers who responded to the scene were able to locate the broomstick that Plaintiff used for self-defense in spite of searching for it.  Newsome testified that his investigation at the scene was limited to verifying Mrs. Lasco's statements and his report only listed the names of Mr. and Mrs. Lasco as witnesses, in spite of there being fifty to seventy five people at the scene.  Newsome testified that he did not interview Stacey Ricks or Notosha Savage.

97.     Plaintiff's injuries were worsened and Plaintiff needlessly suffered severe pain and anguish due to the delay in access to any medical attention.

98.     Plaintiff's broken jaw bones continued to cut through and damage his facial tissue and nerves as he spoke, which he had to do for an extended period of time in his futile efforts to obtain access to medical attention, swallowed, or spit blood.

99.     Plaintiff's untreated gaping mouth wound allowed air to enter his facial and neck tissue

and caused subcutaneous emphysema, which caused Plaintiff needless pain and contributed to his breathing difficulties.

100.    Plaintiff still suffers from jaw pain and nerve damage, which was caused, upon information and belief, by the delay in access to medical care.

101.    Newsome and Lawton were employees of the City acting in the course and scope of their employment and duties at all relevant times.

102.    Upon information and belief, the standard Basic Law Enforcement Training (BLET) course in North Carolina instructs students that the arresting officer's duties mandate that he: "[s]eek medical assistance for suspect if necessary, and otherwise monitor the physical well-being at all times the suspect is in your custody."

103.    Thomas, Harris, and Hines were employees of Sheriff Knight acting in the course and scope of their employment and duties at all relevant times.

104.    Wrongful acts complained of herein were committed by the City's employees or agents within the scope of and in furtherance of its business and duties, were expressly authorized by the City, or were ratified by the City.

105.    Wrongful acts complained of herein were committed by the Sheriff Knight's employees or agents within the scope of and in furtherance of its business and duties, were expressly authorized by Sheriff Knight, or were ratified by Sheriff Knight.

106.    The City and Sheriff Knight are liable for their respective employees' and agents' wrongful acts under the doctrine of Respondeat Superior.

107.    Edgecombe County had a statutory non-delegable duty to provide emergency medical services to prisoners pursuant to N.C. Gen. Stat. § 153A-225 and is liable for not having an adequate plan to provide for emergency medical services to persons such as Plaintiff, and the

failure of Sheriff Knight and his employees, agents, deputies, and jailers to provide Plaintiff access to emergency medical services.

108. Upon information and belief, Hines, Harris, and Thomas were inadequately trained to provide the minimum constitutionally-mandated access to medical attention to persons such as Plaintiff.

109. Upon information and belief, Sheriff Knight did not adequately train, monitor, or supervise the ECDC staff to ensure that the minimum constitutionally-mandated access to medical attention was provided to persons such as Plaintiff.

## CLAIMS FOR RELIEF

### COUNT ONE:
### NEGLIGENCE, GROSS NEGLIGENCE, OR ALTERNATIVELY DIRECT CLAIM UNDER N.C. CONSTITUTION
### (DEFENDANTS CITY, NEWSOME, AND LAWTON)

110. Plaintiff incorporates by reference and re-alleges the allegations in preceding paragraphs as though fully set forth herein.

111. Defendants Newsome and Lawton owed a duty to Plaintiff due to the special relationship created when they took him into their custody,

112. Defendants Newsome and Lawton owed a duty of ordinary care to Plaintiff.

113. Defendants Newsome and Lawton owed a duty as defined by the protections of the constitutions of the United States and North Carolina to ensure that Plaintiff was reasonably seized and that he had access to needed emergency medical attention as an arrestee and/or pre-trial detainee.

114. Defendants Newsome and Lawton breached their duty when:

   a) they knew or should have known that Plaintiff was seriously injured;

   b) Plaintiff repeatedly requested immediate medical attention;

c) Plaintiff repeatedly informed said defendants of his serious injuries;

d) medical attention was immediately available – literally arms-length away at times;

e) said defendants refused to allow Plaintiff access to any medical attention;

f) there was no legitimate reason why said defendants refused to allow Plaintiff access to medical attention; and

g) said defendants did not inform the ECDC of Plaintiff's injuries when they transferred custody of Plaintiff.

115. Said defendants' failure, neglect and/or refusal to fulfill their duties were proximate causes of Plaintiff's injuries.

116. Said defendants acted under color of state law.

117. Newsome and Lawton acted maliciously when they, by way of example and not limitation:

a) needlessly denied Plaintiff access to immediately and readily available medical attention when they could have done so with little to no impact to the discharge of their normal law enforcement duties, manifesting a reckless indifference to Plaintiff's rights;

b) denied Plaintiff access to medical attention when a reasonable law enforcement officer would know that their conduct was in breach of the duty owed to an arrestee in their custody, such as Plaintiff; and

c) intended to deny Plaintiff access to medical attention as part of their effort to ensure that Plaintiff's claim of self-defense, which necessarily depended upon his being attacked and injured, was not given credence by avoiding a paper trail documenting his injuries, and in other ways that may be inferred by their conduct as alleged herein.

118. Said breach of duties by said defendants was a direct, proximate, and foreseeable cause of

Plaintiff's injuries.

119.    As a direct, proximate and foreseeable result of the negligent acts and omissions of said defendants as described herein, Plaintiff has been damaged in an amount in excess of ten thousand dollars ($10,000.00).

120.    Plaintiff is entitled to recover punitive damages from Newsome and Lawton because of the conscious, wanton, reckless and willful disregard of, and deliberate indifference to the safety of Plaintiff, as described herein, in an amount in excess of ten thousand dollars ($10,000.00).

121.    The City is liable for the conduct of said defendants under the doctrine of Respondeat Superior.

122.    In the alternative, if it is found that the City has not waived immunity or that Plaintiff has no adequate remedy at state law, as alleged herein Plaintiff claims that Newsome and Lawton violated his right as a pre-trial detainee to be free from deliberate indifference to serious medical need and/or cruel or unusual punishment and he asserts a direct claim under the "law of the land" and/or "cruel or unusual" provisions of North Carolina's constitution.

## COUNT TWO:
### NEGLIGENCE AND GROSS NEGLIGENCE
### (THOMAS, HARRIS, AND HINES, IN THEIR INDIVIDUAL CAPACITIES, SHERIFF KNIGHT, AND EDGECOMBE COUNTY)

123.    Plaintiff incorporates by reference and re-alleges the allegations in preceding paragraphs as though fully set forth herein.

124.    Edgecombe County had a statutory non-delegable duty pursuant to N.C. Gen. Stat. §§ 153A-224 and 225 to plan and provide adequate medical services and emergency medical services to protect the health and welfare of prisoners, including Plaintiff.  It breached that duty.

125.    Sheriff Knight, by virtue of being the duly elected and inducted Sheriff of Edgecombe County, owed a duty to prisoners in his custody, including Plaintiff, to properly supervise, hire,

retain, manage, train, and control Thomas, Harris, and Hines in the course and scope of the performance of their respective duties. Sheriff Knight had a duty to provide medical attention for those detained by his office, pursuant to the laws of North Carolina, including, but not limited to:

a) N.C. Gen. Stat. § 153A-216, requiring that jails be "operated so as to protect the health and welfare of prisoners and provide for their humane treatment."

b) N.C. Gen. Stat. §§ 153A-221, et seq., which provides for the establishment of minimum standards for confinement facilities, including medical treatment for detainees, that counties such as Wake County must meet.

c) N.C. Gen. Stat. § 153A-224, which requires custodial personnel to "supervise prisoners closely enough . . . to be at all times informed of the prisoners' general health and emergency medical needs" and "shall secure emergency medical care from a licensed physician according to the unit's plan for medical care."

126. Edgecombe County and Sheriff Knight each had a special relationship with detainees such as Plaintiff and a state constitutional and statutory duty to have administrative policies and procedures in place that would not allow jailers or non-medical staff to procedurally and administratively hinder timely access to emergent medical services for individuals such as Plaintiff who are seriously injured, in obvious need of emergent medical care, and are requesting access to medical attention, and to monitor those in such need to ensure they are receiving unhindered timely access to needed medical attention.

127. Edgecombe County and Sheriff Knight breached said duties by failing, neglecting, or refusing to ensure that these duties were properly discharged, which resulted in the seriously injured Plaintiff being denied any medical attention and being left in unchecked and severe pain,

before being administratively allowed access by the jailers to any medical attention, during which time his medical condition deteriorated and otherwise avoidable serious complications and injuries developed.

128.     Edgecombe County breached said duties by failing to develop, adopt, and revise a medical plan for the administration of medical services at the ECDC in a manner that was sufficient to secure the medical needs of Plaintiff.

129.     Edgecombe County and Sheriff Knight's failure, neglect and/or refusal to fulfill their duties were proximate causes of Plaintiff's injuries.

130.     Sheriff Knight and the Thomas, Harris, and Hines owed a common law duty to Plaintiff to exercise ordinary care under the circumstances. They breached that duty.

131.     Sheriff Knight and Thomas, Harris, and Hines had a duty to Plaintiff as their prisoner to provide adequate medical care and safeguard him from any dangers that they knew or should have known that Plaintiff faced to ensure that he was properly monitored and supervised, and that any injuries or medical emergencies were promptly detected, reported, and medically treated as required by N.C. Gen. Stat. §§ 153A-224 and 225, 10A N.C.A.C. 14J.0601. They breached that duty.

132.     Thomas, Harris, and Hines were negligent and so reckless, wanton, and indifferent to the needs and safety of Plaintiff as to constitute gross negligence because they knew that he was seriously injured and was in great pain, yet they refused to allow him access to any medical attention or pain relief.

133.     Thomas, Harris, and Hines acted maliciously when they, by way of example and not limitation:

   a)   needlessly denied Plaintiff, a pre-trial detainee in their custody, access to medical

attention, manifesting a reckless indifference to Plaintiff's rights;

b) denied Plaintiff access to medical attention when a reasonable law detention officer would know that their conduct was in breach of the duty owed a pre-trial detainee in their custody, such as Plaintiff; and

c) intended to deny Plaintiff access to medical attention as part of their effort to obscure the violation of policies and procedures in accepting Plaintiff into custody instead of insisting that Newsome and Lawton take Plaintiff to a hospital for treatment and to avoid or minimize any overtime or external medical expense, and in other ways that may be inferred by their conduct as alleged herein.

134. Sheriff Knight, who was in a position to correct or mitigate these issues and had a common law and affirmative statutory duty to do so, took no action to investigate and/or correct these problems or mitigate their impact to Plaintiff.

135. Said breach of duties by Edgecombe County, Sheriff Knight and Thomas, Harris, and Hines were direct, proximate, and foreseeable causes of Plaintiff's injuries.

136. As a direct, proximate and foreseeable result of the negligent acts and omissions of said Defendants and their agents, servants, and employees as described herein, Plaintiff has been damaged in an amount in excess of ten thousand dollars ($10,000.00).

137. Plaintiff is entitled to recover punitive damages from Thomas, Harris, and Hines because of the conscious, wanton, reckless and willful disregard of, and deliberate indifference to the safety of Plaintiff, as described herein, in an amount in excess of ten thousand dollars ($10,000.00).

### COUNT THREE:
### N.C. GEN. STAT. § 58-76-5 NEGLECT, MISCONDUCT, OR MISBEHAVIOR IN OFFICE
### (SHERIFF KNIGHT IN HIS OFFICIAL CAPACITY AND SURETY)

138.    Plaintiff incorporates by reference and re-alleges the allegations in preceding paragraphs as though fully set forth herein.

139.    Sheriff Knight and his detention officers neglected the duties of the office of Sheriff of Edgecombe County as alleged in the preceding paragraphs.

140.    As alleged herein, Sheriff Knight and his detention officers neglected the duties of and/or committed acts of misconduct and/or misbehavior in the office of Sheriff of Edgecombe County.

141.    Plaintiff suffered injuries as a result of said neglect or misconduct.

142.    Said neglect, misconduct, or misbehavior in the office of Sheriff of Edgecombe County was a proximate cause of injury to Plaintiff.

143.    Surety, through the Sheriff bond, is also liable to Plaintiff for his injuries caused by said neglect, misconduct, or misbehavior in office.

144.    As a direct and proximate result of the action and inaction described herein, Plaintiff has been damaged in an amount in excess of ten thousand dollars ($10,000.00).

## FEDERAL CLAIMS

### COUNT FOUR:
### 42 U.S.C. § 1983/FOURTEENTH AMENDMENT:
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED
### (NEWSOME, LAWTON, THOMAS, HARRIS, AND HINES, IN THEIR INDIVIDUAL CAPACITIES)

145.    Plaintiff incorporates by reference and re-alleges the allegations in preceding paragraphs as though fully set forth herein.

146.    Said defendants intentionally deprived Plaintiff of his right to receive needed medical care as protected by the Fourteenth Amendment.

147.    Said defendants were aware that Plaintiff required immediate medical attention and that he was in great pain.

148.    There was no legitimate medical or penological interest for denying Plaintiff access to the

immediate medical attention that he required.

149.    Said defendants violated one or more of their respective agencies policies or procedures, and/or regulations or law of North Carolina in denying Plaintiff access to immediate medical attention.

150.    Said defendants acted under color of one or more statutes, ordinances, regulations, customs, and/or usages of the State of North Carolina and/or the Sheriff of Edgecombe County or the City of Rocky Mount when they deprived Plaintiff of said rights.

151.    At all times complained of, Plaintiff was a citizen of the United States, and further was a person subject to the jurisdiction of the United States.

152.    The said deprivations of rights, privileges, and immunities proximately caused injuries to Plaintiff.

**COUNT FIVE:**
**42 U.S.C. § 1983 /FOURTEENTH AMENDMENT:**
**FAILURE TO TRAIN, FAILURE TO IMPLEMENT PROPER POLICIES**
**(SHERIFF KNIGHT IN HIS OFFICIAL CAPACITY)**

153.    Plaintiff incorporates by reference and re-alleges the allegations in preceding paragraphs as though fully set forth herein.

154.    As alleged herein, Sheriff Knight did not have a training regimen in place to ensure that the Defendant Detention Officers were adequately trained on the policies and procedures of the ECDC and the laws and regulations of North Carolina that prescribe the minimum constitutional standards for dealing with provision of access to medical attention for prisoners with serious injury, such as the Plaintiff.

155.     As alleged herein, Sheriff Knight did not implement policies and procedures to ensure that prisoners such as the Plaintiff receive the minimum constitutional standard of access to medical attention.

156. Sheriff Knight's failure to train and failure to implement proper policies reflected a deliberate indifference to the prisoners in his custody, such as the Plaintiff.

157. Sheriff Knight's failure to implement proper policies were motivated by the improper purpose of avoiding liability for medical services and emergency medical services required for the health and welfare of prisoners such as Plaintiff.

158. Sheriff Knight should have known that his failure to train would likely result in injuries to the prisoners in his custody, such as the kind suffered by Plaintiff.

159. Sheriff Knight's failure to implement proper policies as alleged herein made it inevitable that the kind of injuries suffered by Plaintiff would occur.

160. Sheriff Knight's failure to train and failure to implement proper policies were causes in fact and proximate and foreseeable causes of Plaintiff's injuries.

161. Said Defendant acted under color of one or more statutes, ordinances, regulations, customs, and/or usages of the State of North Carolina and/or the Sheriff of Edgecombe County when they deprived Plaintiff of said rights.

162. At all times complained of, Plaintiff was a citizen of the United States, and further was a person subject to the jurisdiction of the United States.

163. The said deprivations of rights, privileges, and immunities proximately caused injuries to Plaintiff.

## DAMAGES

164. Plaintiffs incorporate by reference and re-allege the allegations in preceding paragraphs as though fully set forth herein.

165. As a direct, consequent, and proximate result of the aforesaid acts and omissions of the Defendants, Plaintiff has been injured in his body and mind, has been prevented from transacting

27

his normal business, and have otherwise been afflicted with great pain and suffering, permanent partial loss of function and has incurred pecuniary losses, including but not limited to medical treatment and related expenses.

166.    Wherefore, the Plaintiffs is entitled to recover from the Defendants, jointly and severally, compensatory damages for said pecuniary losses, and inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses in excess of Ten Thousand Dollars ($10,000.00) in an amount to be established at trial.

167.    The conduct of the Individual Defendants involved reckless or callous indifference to Plaintiffs' federally protected rights or was motivated by evil intent.

168.    Wherefore, the Plaintiff is entitled to recover from the Individual Defendants punitive damages in excess of Ten Thousand Dollars ($10,000.00) in an amount to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the Plaintiff respectfully prays this Court for relief as follows:

1.    That the Plaintiff have and recover of the defendants, jointly and severally, the maximum compensatory damages allowed by federal law, including pre-judgment and post-judgment interest;

2.    That the Plaintiff have and recover of the individual-capacity defendants the maximum punitive damages allowed by federal law, including pre-judgment and post-judgment interest;

3.    That the Plaintiff have and recover of the defendants, jointly and severally, the maximum compensatory damages allowed by North Carolina law, including pre-judgment and post-judgment interest;

4.    That the Plaintiff have and recover of the individual-capacity defendants the maximum

punitive damages allowed by North Carolina law, including pre-judgment and post-judgment interest;

5.      That the Plaintiff have and recover from Surety the full amount of the Sheriff's bond(s).

6.      That the Plaintiff have and recover from the defendants, jointly and severally, attorneys fees as provided by law;

7.      That the Plaintiff be granted a trial by jury on all issues so triable, except for any issues of law or fact relating to insurance as contemplated and required by N.C. Gen. Stat. §§ 153A-435 and 160A-485(d);

8.      That the costs of this action be taxed against the defendants, jointly and severally;

9.      That the Plaintiff be granted such other and further relief as this court may deem just and proper.


This the 21st day of January, 2014.


DOGGETT LAW OFFICES                          LAW OFFICES OF GREGORY M. KASH


/s/Eric L. Doggett                               /s/Gregory M. Kash
ERIC L. DOGGETT                               GREGORY M. KASH
Attorney for Plaintiff                            Attorney for Plaintiff
N.C. State Bar # 39639                         N.C. State Bar # 14203
3737 Glenwood Avenue Suite 100                434 Fayetteville Street, Suite 2350
Raleigh, North Carolina 27612-5515            Raleigh, North Carolina 27601-1787
Telephone:     (919) 782-2979                 Telephone:     (919) 861-2006
Facsimile:     (919) 789-2796                 Facsimile:     (919) 861-0170
Email:  Eric@DoggettLawOffices.com            Email:        GregKash@mindspring.com

29